IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SEARCH OF: ) | |
| ) | Crim. No. |
| THE PREMISES LOCATED AT ) | |
| 3415 BROWN ST., NW #A ) | |
| <u>WASHINGTON, DC 20010</u> ) | |

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE</u>

I, Jenny M. Cutalo-Patterson, a Special Agent with the Federal Bureau of Investigation (FBI), Washington Field Division, Washington, D.C., being duly sworn, depose and state as follows:

1. Your affiant has been employed with the FBI since October 2005, and is currently assigned to the Washington Field Office, Northern Virginia Resident Agency (NVRA). Since joining the FBI, I have investigated violations of federal law involving Counterintelligence matters and currently investigate federal violations concerning child pornography and the sexual exploitation of children. I have gained experience in conducting such investigations, through formal classroom training, and on-the-job training. Your affiant has been involved in investigations involving the exploitation of children, including offenses involving the dissemination of child pornography on the Internet via computer.

2. As a federal agent, I am authorized to investigate violations of laws of the United States and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3. This affidavit is made in support of an application for a warrant to:

   a. search the entire premises located at 3415 Brown St., NW #A, Washington, DC

1

20010 (the "SUBJECT PREMISES"), which is more particularly described in Attachment A, inclusive of the computers, computer hardware (including peripheral input/output devices), computer software, and computer related documentation found there; and

      b. seize the items specified in Attachment B, which constitutes instrumentalities, fruits, contraband, and evidence of violations of Title 18, United States Code Sections 2252 and 2252A.

    4. The statements contained in this affidavit are based on your affiant's knowledge, information provided to me, and through a review of reports and database records.

    5. Because I submit this affidavit for the limited purpose of securing a search warrant, your affiant has not included each and every fact known to me concerning this investigation. Your affiant has set forth only the facts believed necessary to establish probable cause to believe that violations of Title 18, United States Code, Sections 2252 and 2252A have occurred and that evidence of those violations is located at the SUBJECT PREMISES.

    6. Terms in this Affidavit and its Attachments are defined below.

## STATUTORY AUTHORITY AND DEFINITIONS

    7. This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors. Descriptions of the relevant statutes and definitions are provided below:

      a. Title 18 United States Code, Section 2252(a)(2), prohibits the knowing receipt or distribution of any visual depiction of a minor engaging in sexually explicit conduct that has been mailed or shipped or transported in interstate or foreign commerce.

      b. Title 18 United States Code, Section 2252(a)(4), prohibits the possession of one or more books, magazines, periodicals, films or other materials which contain visual depictions

of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce or that were produced using materials that have traveled in interstate or foreign commerce.

    c. Title 18 United States Code, Section 2252A(a)(2) prohibits the knowing receipt or distribution of any child pornography - or any material that contains child pornography - that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

    d. Title 18 United States Code, Section 2252A(a)(5)(B) prohibits the knowing possession of any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including computer, or that was produced using materials that have been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

    e. "Child Erotica" as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

    f. "Child Pornography" as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaged in sexually explicit conduct or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves

the use of a minor engaged in sexually explicit conduct (see Title 18, United States Code, Sections 2252 and 2256(2)).

      g.    "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See Title 18, United States Code, Section 2256(5).

      h.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See Title 18, United States Code, Section 2256(2).

      i.    "Computer" as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

      j.    "Computer hardware" as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

k.      "Computer software" as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic or other digital form.  It commonly includes programs to run operating systems, applications and utilities.

l.      "Computer-related documentation" as used herein, consists of written, recorded, printed or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software or other related items.

m.      "Computer passwords and data security devices" as used herein, consist of information or items designed to restrict access to or hide computer software, documentation or data.  Data security devices may consist of hardware, software or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips and circuit boards.  Data security software of digital code may include programming code that creates "test keys" or "hot keys", which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

n.      The terms "records", "documents" and "materials" as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard

disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

o. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

## COMPUTERS AND CHILD PORNOGRAPHY

8. Based upon my training and experience as well as my discussions with others involved in child pornography and enticement investigations, computer and computer technology have revolutionized the way in which child pornography is produced, distributed, received and possessed:

a. Child pornographers can now transfer photographs onto a computer directly from a digital camera or from a regular camera a scanner. A computer's electronic storage media (commonly referred to as a hard drive) can store tens of thousands of images at very high resolution. In addition, magnetic storage located in host computers makes it possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image in another country. Once done there is no readily apparent evidence at the

"scene of the crime". Only careful laboratory examination of electronic storage devices can recreate the evidence trail.

  b. A modem allows any computer to connect to another computer through the use of telephone, cable or wireless connection to allow contact with millions of computers around the world. The Internet and its World Wide Web provide child pornographers several relatively secure and anonymous ways to obtain, view, and trade child pornography. Users can find individuals with similar interests or child pornography websites. Distributors can use memberships and subscription-based websites to conduct business.

  c. Collectors and distributers of child pornography can set up an account with a remote computing service that provides e-mail services and electronic file storage. Evidence of such online storage of child pornography may be found on the user's computer.

  d. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or Internet Service Provider client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence which shows that a computer contains peer to peer software, when the computer was sharing files and even some of the files which were uploaded or downloaded. Such information may be maintained indefinitely until overwritten by other data.

9

9. Computers have also revolutionized the way individuals can communicate with each other making it easier to entice minors. Individuals now have access to social media, email, and chat platforms on computers and almost all smartphones, therefore, making access to minors constant and almost immediate.

## **CHARACTERISTICS OF CHILD PORNOGRAPHERS**

10. Based upon your affiant's experience and training, the following traits and characteristics are generally found to exist and be true in cases involving individuals who collect child pornography:

    a. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

    b. The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

    c. The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail

groups, bulletin boards, IRC (Internet Relay Chat), newsgroups, instant messaging and other similar vehicles.

  d. The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

  e. The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices or merely on scraps of paper.

  f. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their homes or other secure location.

  g. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued

highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis; however, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools.

### **PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES**

11. This application concerns the use of a Kik Messenger account to receive and distribute child pornography. Kik Messenger is a chat application for mobile devices in which users can send text messages, pictures, and videos to other users. Users can communicate directly with an individual or with multiple users in a group chat. When signing up for a Kik account, a user supplies an email address (which does not have to be verified), a unique username, and a display name that is seen when chatting with others. Kik conversations, uploaded pictures/videos during the chats, can be forensically extracted or video recorded from a mobile device. When reviewing an extracted Kik chat, an investigator will typically see a screenshot from that video, or an icon indicative of a video file.

12. Last year, the Salt Lake City Division of the FBI had an investigation on Kik user "KitB10", identified as Daxton T.B. Hansen. The FBI discovered that Hansen maintained his Kik account to share, post, and trade images of child pornography. In April 2017, the Salt Lake City Division conducted a search warrant on Hansen's residence and seized multiple electronic devices, several of which contained possible child pornography. During the interview conducted with Hansen, he admitted to viewing and sharing child pornography for approximately two years on Kik using the "KitB10" profile. Additionally, the FBI learned that Hansen was in communication with hundreds of users on Kik and was the Administrator of multiple child pornography groups on Kik, in which the members traded nude images or videos of young

prepubescent boys engaged in various sexual acts. Hansen and the other Kik users he communicated with frequently traded child pornography via Dropbox, pCloud, and other cloud based storage. Hansen provided consent for FBI to assume his Kik identity in an undercover capacity.

13. Based on Hansen's consent, an undercover agent (UC) in the Salt Lake City Division assumed Hansen's "KitB10" Kik account and conducted several undercover sessions during April and May 2017. On or about April 29, 2017, the Kik user "cjbwdc" with display name "Trading Dropbox" joined a Kik group called "Boys links Only! Send On Entry Or be kicked". Hasen was one of the moderators of this Kik group. Shortly after joining, one of the other moderators tells the user "cjbwdc" that the account needs to "send or leave", which in my training and experience usually means that a user must post child pornography in order to remain an active member of the group  User "cjbwdc" posts "young right" and the moderator responds "boys only". Then on April 29, 2017, at approximately 10:07 p.m., the account "cjbwdc" posted a Dropbox link to the group. The content of this link is unknown as the UC was not able to obtain the content at the time the UC observed the link, and the content is no longer available. There were five additional UC sessions conducted in May 2017 in which "cjbwdc" was still a member of this same Kik group. During these sessions, other Droplinks were posted to the group that contain possible child pornography. Additionally, comments are made by other members in the group about incest, young boys, age 10 and under, 5 year olds, toddler age, or dad/son. Around May 22, 2017, the UC was removed from the group, presumably for failing to distribute child pornography to the other members of the group.

14. Before the UC was removed from the group, the UC downloaded possible child pornography that would have been available to the members of the Kik group, including

13

"cjbwdc". The following are examples of what was downloaded from the available links:

    a. The file titled "9(1) copy.mp4" is a video file that depicts what appears to be a naked prepubescent male in the shower with an adult male, of which only his penis can be seen. The child performs oral sex on the adult male penis, licks the penis, and masturbates the penis. The adult male masturbates himself with his penis pressed against the child's mouth. The adult male then masturbates himself to completion near the child's mouth and the child then licks some of the ejaculate.

    b. The file titled "NV-0139 GAY PRETEEN KDV 06.mpg" is a video depicting what appears to be two prepubescent clothed male children sitting on a bed. During the video the children undress, masturbate each other, masturbate themselves, and have oral and anal sex with each other.

    c. The file titled "Night25.avi" is a video that depicts a prepubescent naked male child on top of a naked adult male, who appears to be lying on bed. The child masturbates the male penis and performs oral sex on the male penis. The video then appears to show the male penis being inserted into the child's anus while the child holds the penis. The male then masturbates the child's penis. The male has anal sex with the child while masturbating the child. The video has the words "AaronGermany Production" across the bottom the entire time.

15. From approximately October 12-19, 2017, the UC engages "cjbwdc" directly by stating "Hey anything new to trade?" and "I have links". "cjbwdc" responds with "send young". The UC asks "what age do u have? or do you want?". "cjbwdc" responds "Under 12". The UC makes several posts after this which were not answered by "cjbwdc".

16. A subpoena was issued to Kik for information on the user account "cjbwdc" and the results dated 07/17/17 revealed an email address of cjbwdc11@gmail.com, an account

registration date of 06/04/15, and as of 06/12/17 an iPhone was being utilized to access Kik. Additionally, Internet Protocol (IP) Address records from 06/19/17 to 07/12/2017 show 71.62.172.90 as the only IP being used during this time frame. A subpoena was issued to Comcast for IP address 71.62.172.90 on 06/19/2017. The results dated 08/14/17 reveal the subscriber to be Will SMITH, 20362 Mount Pleasant Ter, Ashburn VA 20147, 814-688-6065. The records also reveal this IP was assigned to SMITH as of 03/02/17 through 08/14/17, which was the date range of the subpoena returns. This IP assignment date range also overlaps with the dates of the UC sessions.

17. A subpoena was issued to Google for the cjbwdc11@gmail.com account. The results dated 11/01/17 revealed the account was created on 08/10/15 to CJ Beed. There were no IP logs associated with this account.

18. A subpoena was issued to Kik for "cjbwdc" and the results dated 01/10/18 revealed the account was still active and as of 01/10/18 an iPhone was still being utilized to access Kik. Additionally, there were several IP address associated with this account from 12/11/17 to 01/10/18. Three of the IP addresses were for Verizon and a subpoena was issued for those IP addresses. The results of the subpoena on 01/16/18 indicate these were Verizon Wireless Mobile IP addresses. An examination of the information provided by Verizon identified the target telephone number that utilized these IP addresses to be 214-949-0996. The subscriber was identified as Raventek Solution Partners, 13900 Lincoln Park Drive, Ste. 150, Herndon, VA 20171. The account for this telephone number has been active since 05/13/17 and was currently active as of the date of the subpoena. The IMEI for the telephone was provided as 355342081245513. There was an additional IP address that resolved to Comcast for 12/30/17 and 01/02/18, in which the subscriber was Jeffrey Marn, 3415 Brown St, NW #A, Washington,

DC 20010.

19.  In February 2018, a 2703(d) Court Order was issued to Apple, Inc. for information pertaining to telephone number 214-949-0996.  The return information provided by Apple, Inc. included the customer to be Corey GIRMAN, 3425 Porter St., NW, Washington, DC with an email address of coreymgirman@yahoo.com.

20.  In August 2018, an open source query for "cjbwdc" was conducted.  Dozens of postings were located on the website "Sexting on Kik" ([www.sextingonkk.com](www.sextingonkk.com)) beginning in February 2016 through May 2018 linked "cjbwdc" to Kik account "chelsbbbb".  The "Sexting on Kik" profile username, "Cjbusa", was created in February 2016 with a most recent posting in September 2018.  In order to contact "Cjbusa", the user posts provide the Kik contact name "cjbwdc" or "chelsbbbb" or both.  The user "Cjbusa" had approximately 75 threads on the account related to the trading of Dropbox links containing child pornography.  Examples are as follows:

   a.  June 27, 2016 titled "Dropboxtrade Group" and with contents "if you want to trade young, send a link to start.  If you want to be added to the group, send two young links and I will add you, we trade daily.  Kik chelsbbbb of cjbwdc".

   b.  May 12, 2018 titled "Young Dropbox Group" and with contents "Have an active young Dropbox trading group.  Send 2 links and I'll add you to the group.  Must be young.  Under 15.  Kik: chelsbbbb".

   c.  September 5, 2018 titled: "Young trading group" and with contents "Young links (Dropbox/mega) only, send 2 links and I'll add you to the group ☺ we are active, please be active too. And be girls or boys ☺ Young, young bjs, young lesbian, young fucking :P Kik: chelsbbbb"  Followed by numerous smiley face emojis.

21. A Grand Jury subpoena was issued to Kik for "chelsbbb" and the results dated 08/15/18 revealed the user name to be "C B" with an unconfirmed email address of chelsbbbb@gmail.com, an account registration date of 01/21/16 and an iPhone was being utilized to access Kik. Additionally, there were IP address associated with this account from 07/19/18 to 08/09/18. The most recent IP address was 73.163.34.138. A Grand Jury subpoena was issued to Comcast for this IP address during the time frame provided by Kik. The results provided by Comcast dated 08/22/2018 revealed the subscriber was still Jeffrey Marn, 3415 Brown St, NW #A, Washington, DC 20010.

22. Open source and law enforcement sensitive information revealed Corey GIRMAN resides at 3415 Brown St., NW, Washington, DC (the SUBJECT PREMISES) as of February 2018. Information provided by the United States Postal Inspection Service (USPIS) that Corey Girman receives mail at the SUBJECT PREMISES and had put in a change of address to that location in December 2017. Additionally, a professional networking profile was located indicating GIRMAN is a Systems Engineer at Raventek Business Group.

23. Utilizing the information that GIRMAN resides at the SUBJECT PREMISES, which is where the IP addresses for the most recent activity of both Kik accounts "cjbwdc" and "chelsbbbb", coupled with GIRMAN appearing to be employed at RavenTek, which is the company providing the telephone number associated with IP addresses linked to activity of the "cjbwdc" Kik account, and based on the fact that a Kik username cannot be reused, it is believed that GIRMAN is the user of the "cjbwdc" and "chelsbbbb" Kik accounts.

**SEARCH AND SEIZURE OF COMPUTER SYSTEMS**

24. Your affiant knows that when a computer user saves a file to the computer's hard drive or other storage media, the system assigns the data to specific clusters or locations on the

17

media, which are then reserved. The event may also be recorded in other files on the computer such as .dat and link files. If the user later deletes a file, the data is not actually erased, but rather the system marks those previously reserved clusters as once again being available for use. The original data is still intact on the media. The data is recoverable until it is overwritten either by the use of a "wiping" program or when new files are saved and assigned the same clusters. The process of overwriting may not eradicate the entire file, leaving portions available for recovery. It is therefore possible that the data can be recovered for an extended period of time even after the file itself has been "deleted". It is not unusual for this data to remain on the computer for months or years later. Until the data is overwritten, it is still in a recoverable state. Comparison of this recoverable data to known file names, files or images, can assist in establishing whether the computer was in fact used at some time to commit or facilitate the commission of the offense of possession, receipt and/or distribution of images of child pornography.

25.     Your affiant knows from training and experience that persons trading in, receiving, distributing or possessing images involving the exploitation of children or those interested in the actual exploitation of children often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify the origin of the images as well as provide evidence of a person's interest in child pornography or child exploitation.

26.     Your affiant knows from training and experience that files related to the exploitation of children found on computers are usually obtained from the Internet using application software which often leaves files, logs or other file remnants which would tend to show the exchange, transfer, distribution, possession or origin of the files. Also, computer software or hardware exists that allows persons to share Internet access over wired or wireless

networks allowing multiple persons to appear on the Internet from the same IP address. Examinations of these items can reveal information about the authorized or unauthorized use of an Internet connection at the residence.

27. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals and others) can store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password-protected or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an

operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

28. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

29. In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, modem, and router are all instrumentalities of the crime(s), within the meaning of 18 U.S.C. §§ 2251 through 2256, and should all be seized as such.

## COMPUTER EXAMINATION METHODOLOGY TO BE EMPLOYED

30. The examination procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other examination procedures may be used):

    a. examination of all of the data contained in such computer hardware, computer software and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

    b. searching for and attempting to recover any deleted, hidden or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the

criminal activity, (3) contraband, (4) otherwise unlawfully possessed or (5) evidence of the offenses specified above);

      c.      surveying various file directories and the individual files they contain;

      d.      opening files in order to determine their contents;

      e.      scanning storage areas;

      f.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

      g.      performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

31. Based upon the above information, there is probable cause to believe that (1) an individual residing at the SUBJECT PREMISES used a mobile device and/or computer connected to the Internet located within the SUBJECT PREMISES to violate Title 18, United States Code, Sections 2252 and 2252A, which make it a federal crime for any person to produce, knowingly receive , distribute or possess child pornography; and (2) the fruits, evidence, contraband, and instrumentalities of these offenses, described in Attachment B are located at the SUBJECT PREMISES.

32. Based upon the foregoing, I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

        Respectfully submitted,

        _____

        Jenny M. Cutalo-Patterson
        Special Agent
        Federal Bureau of Investigation

Sworn and subscribed before me this _____ day of October, 2018.

_____
Deborah A. Robinson
UNITED STATES MAGISTRATE JUDGE
District of Columbia